Mr. Hiller, are you ready? Yes, Your Honor. Thank you. Good to see you. Good afternoon, Your Honors, and may it please the Court. I'm Mark Hiller with Robinson Bradshaw for the appellants. The District Court made a series of errors in this case, and I will focus mainly on two of them. First, the Court allowed the plaintiffs to turn what should have been a simple trial on the question of contract damages into a tort case where our client, Cadrillion, was the bad actor. The plaintiffs did this through settlement communications that are flatly barred by Rule 408 and other evidence that was irrelevant and highly prejudicial. The second main error the Court made was that the Court gave the plaintiffs a windfall of more than a million dollars of attorneys' fees and expenses solely pursuant to a contractual fee shifting provision that, if you read the provision, you see that it encompassed this dispute. There's additional errors that we'll, I'm sure, discuss as well that are in the brief, but those are the two I'll focus mainly on. As to the first issue, the trial of this case could not have been narrower. The question for the jury was simply to calculate the element of contract damages, which is measured by the call price in the party's contract using their formula. Even then, the issue was actually narrower than that because both sides' experts agreed on most of the aspects of how to calculate the call price, and the entire case really came down to just two arcane issues of accounting and valuation judgments. But rather than stick to the evidence that's relevant to that question about damages, the plaintiffs essentially turned this trial into a tort case all over again, much the same as they did the last time this appeal was before the Court. In particular, right off the bat in their opening statement, they told the jury that the contract in this case requires Kedrillion to calculate the call price in good faith, and they then argued that Kedrillion did not do so because it had calculated the call price eight different times. Plaintiffs' counsel then recited for the jury in the opening every one of those eight prior calculations ranging from negative $156,000 to over a million dollars. The plaintiffs then continued with that strategy with every one of their fact witnesses eliciting testimony regarding the fact that Kedrillion had at prior stages of the case, including in settlement discussions, calculated the call price in divergent amounts, and then they circled back to the issue again and emphasized it in their by itself is sufficient to resolve this first issue in the case that warrants a retrial, but beyond 408, all of the evidence of the prior call price calculations should have been excluded under Rule 402 or alternatively, and at minimum, Rule 403 because none of it was relevant in any way to the issues that were before the jury. Specifically, Your Honors, no party, neither the plaintiffs nor the defendant, was arguing that these prior call price calculations are actually evidence of what the call price is, and no expert relied on those calculations to come up with its own, in this case, both his calculations of the call price. The only effect of this prior call price evidence and the prior calculations was to prejudice Kedrillion by presenting Kedrillion to the jury as a bad actor. In other words, to invite the jury to calculate the call price not based on the evidence before the jury of what the call price is, but based on which party the jury liked better and based on the jury's perception as argued by the plaintiffs that Kedrillion was a bad actor. Yes, Your Honor. Well, I mean, just, I guess, I do have a question, I suppose, just as a common sense matter. I'm just trying to picture myself being a juror in this case. Why wouldn't it be relevant to sort of the credibility of your experts' calculations that there had been a prior, during which Kedrillion was coming up with a whole bunch of different numbers? I mean, I just don't understand why that wouldn't be relevant. Yeah, so there's two problems with that argument, and I would venture that that's why, note in their brief, they make this argument last. The first is that, right, you know, sort of out of the gate, Rule 408A explicitly prohibits the use of- Oh, I'm sorry. I was just talking, I was talking about your relevance argument. Sure. So within the context of relevance, that's not how they use it. So in other words, Your Honor's hypothesis or the scenario you're envisioning is where they're using this to impeach our testimony of what the call price is and to say, well, look what happened before. And the reason that argument doesn't work is because the plaintiffs very clearly did not limit this evidence in any way for impeachment purposes. This was their primary thrust of their argument that they used in their case in chief as substantive evidence in their opening with each one of their witnesses. There was certainly no, you know, over our objection every time, there was no limiting instruction to use it for impeachment purposes at all, that they were introducing this evidence as part of their case where they were trying to prove the call price. And as we argued repeatedly to the trial court below, evidence of what quadrillion may have calculated this price to be before, particularly in draft calculations, had nothing at all to do with their experts' testimony of what the call price is. So at the very most, if they tried to use it for impeachment, that's simply not how they were using it. And what I would offer, I think Your Honor hit the nail on the head with the question of common sense. I mean, to put this in context, if you haven't, you know, to the extent that the transcript is in top of mind, I mean, this was not a one-off issue or a drop of evidence, you know, in an ocean of otherwise permissible evidence. This was the marquee disputed issue in the trial. It was the subject of a heated motion in limine, followed by an extensive motion in limine hearing that immediately preceded the beginning of the testimony moments later. The judge went back and forth and then eventually said that it's not possible to rule out of context and so deferred the rulings. And then there were myriad objections and sidebars. And I'd say the common sense of it, if anything works the opposite way, it's that, you know, the, you know, why did the plaintiffs go to these lengths and fight so bitterly to get before the jury evidence of what everybody agrees the call price is not? When the only question is what evidence, you know, what is the call price? Instead, they're focusing the jury on evidence that everybody agrees is not the call price. And there's no- But just, and this really is, I'm just trying to make sure I remember, there was a point at which Kedrillian thought that was the call price, right? Because they were arguing, as I recall, I mean, this is our second time with this case, so I'm thinking back a bit. But they did argue, they fought liability on breach of contract through the first trial, right? So all that time they were arguing, no, no, this is the right number. And now, as I understand your argument, it's like, well, that's bygones. We've already conceded now that we did breach the contract. The whole part of time where we were coming up with these other numbers and saying that's the call price, that's no longer relevant because now we, after trial, we have decided to concede liability. That's basically the argument, right? Well, I think there's a significant distinction between the prior, within the prior call price calculation. So the particular calculation your Honor just mentioned was the one that Kedrillian urged at the prior trial. But in the retrial, when the plaintiffs were focusing the jury on eight or more prior call price calculations, they certainly were not limiting their evidence to that one prior calculation, which would not have been particularly helpful to their case because then the amount of that calculation is pretty close to the one that's offered in this trial. So the critical point is that they were emphasizing the breadth and the number of prior call price calculations, only one of which was offered at trial, most of which the record shows were offered in settlement, literally in settlement agreements, and were styled as draft calculations, never formal calculations. So even if you were to, you know, set aside that one prior calculation that was actually the subject of testimony, the damage is done in this case because the jury, again, by plaintiffs is being told that Kedrillian has calculated it over and over and over again, and then lists the amounts. The plaintiffs make reference to curative instructions. The instructions did not cure anything. Nowhere in those instructions did the court ever tell the jury that in calculating the call price, the jury should not consider the issue of good faith and should not consider as affirmative substantive evidence the fact that these calculations were reached or draft calculations in widely inconsistent amounts. Plaintiff's brief makes reference to an instruction where the court said to disregard the actual value of a prior calculation. To be very clear on that, that came at the very end in the closing argument where plaintiff's counsel began reciting the numbers after a ruling that that was not allowed. But to be clear, the court never instructed the jury not to consider the numbers that plaintiff's counsel similarly recited in the opening statement where he walked the jury through all eight of them. And again, apart from that, it was elicited that the fact of the prior calculations and their being inconsistent with every one of the witnesses. So we think that 402 and 403 certainly are a basis to warrant a new trial, but we also think without doubt 408 is sufficient by itself because the 408 calculations, those are the ones that the plaintiffs elicited with their two primary fact witnesses, Diane Disser and Scott Peters. And I would just point your honor to the concession they make at page 40 of their appellate where they say, quote, call price calculations were also referenced in proposed settlement agreements. So there is no dispute in this case that what we argue are 408 communications actually were conveyed in settlement documents. And that's why the court correctly held that the documents themselves cannot be admitted, but nonetheless the court erred by then allowing testimony as to the very substance of those communications. And I would just leave this issue, I guess, by saying that the prejudice here was stark and it was clear. It's the difference of just a black and white difference of two completely different trials. On one hand, you have candidly a pretty bland trial where jurors are being brought in after the fact for a damages question where they're really resolving just two primary issues of arcane accounting and instead what the plaintiffs did, and again, we think that the common sense of why they chose to do this is that they transformed the nature of that trial into a tort trial all over again. The entire concept of good faith, who's the good actor, who's the bad actor, that is absolutely irrelevant to the juror's task of picking a number. But unfortunately for our client, it was a very effective strategy with the jury. And we think that certainly it meets this court's prejudice standards in cases like the McSherry case, which was the subject of a Rule 28J letter, as well as a Nagy case, N-H-E-Y, we cite. Those each involved a 408 or a 403 issue. And in both cases, the court said, look, if we picture what this trial would have looked like without the impermissible evidence, then sure, very much so the jury might have gone in a different direction. And that's certainly the case here. With time going down, I do want to make sure I touch on the fee shifting issue. I think the most remarkable aspect of that is that the plaintiffs make virtually no effort in their brief to defend the fee award on the merits. We show using virtual interpretation that there is one and only one meaning of the fee shifting clause, and that is that that clause unambiguously does not encompass this dispute, but instead is limited to disputes under non-competition and confidentiality provisions in Article 11 of the District Court's analysis relied exclusively on the fact that the word that the fee shifting clause in Section 11.6 uses the capitalized word agreement, which is defined to mean agreement as a whole and not only Section 11.6. And what we show among other... Did you raise this argument first time around? First time around being in 2016, yes, absolutely. We raised this argument explicitly at the first available opportunity when the plaintiffs requested fees following the first trial in 2016. Before this court, you raised that argument. So if I go back and look at the briefs in that case, I'll find this argument. No, Your Honor. Are you familiar with the mandate rule? We are, Your Honor. And so the mandate rule, we've extensively briefed that. Your Honor, I would note that this court did not decide the question of the scope of 11.6 in the prior... But, sorry, I thought you had a question, Your Honor. But what we say is that even on the assumption that the mandate rule applies, what we've shown in both of our briefs is that this error clearly comes within the exception that's well-established for the mandate rule for clear error and a manifest injustice. I'm sorry, Your Honor. Did you have a question? Yeah. Oh, actually, I do have a slight follow-up question. Did you raise this argument before the district court in this proceeding? Yes. So that's what I was trying to clarify, Your Honor. So the timeline of the argument is that our side raised this argument at the first available opportunity in 2016 at the end of the first trial when the plaintiffs sought fees. We briefed that to the district court, and the district court decided the issue. On appeal, we challenged the fee award, but we did not expressly raise the issue. And then on the reincorporated its reasoning in a footnote to its most recent opinion that we're appealing from. And what we've shown in our brief is that even on the assumption that the mandate rule would otherwise apply, we clearly meet the requirements of the clear error exception. We studied numerous... But I guess I'm just trying... I understand your argument on the mandate rule. I'm trying to figure out whether you waive the argument again when you didn't raise it in the district court in this proceeding. Yes, Your Honor. So we did not expressly raise the 11.6 with argument. But to be clear, we did not view that... I see my time has expired, but I'm happy to complete that answer if I... Please. Yeah. Yeah. So our position on that is that that would not change the analysis in any way, because as Judge Motz pointed out, if you're already on the assumption that the mandate rule applies from not having pressed it in the prior appeal, we certainly don't think the analysis would be any different based on waiver. As Your Honors know, waiver, if anything, and really, if anything, it would be a forfeiture doctrine. But both waiver and forfeiture are... They are flexible prudential doctrines. And I think the exceptions are broader, if anything, than they would be for the mandate rule. Right. So maybe you waived it, but assuming one way or another, you have to get through an exception. Okay. Yes. And we cite numerous cases in our brief showing where similar errors have met the clear error exception. And in terms of a limiting principle that we'd offer the court for the prejudice prong, the appellate courts have found the clear error exception to be met, whereas here, the error denies a party a dispositive defense or dispositive ability to bring a claim. And so that's exactly what we have here, where this fee shifting issue really is a standalone $1 million, $1.1 million issue. It's almost the same amount as the contract judgment. And if our argument prevails, then they were not entitled to even a penny of attorney's fees. It is simply a windfall based on a misreading of the contract. And the one case I'd offer, in addition to what we've cited in the briefs, is the Santiago case from the First Circuit, and that's F579, F3rd 45. It's a similar posture and gets at the concept of prejudice. I do see that I'm over time, and I do want to make sure to reserve a little over two minutes for rebuttal. So unless there's any other questions, I'd be happy to hold off for now. Thank you, Mr. Hiller. Mr. Barrett? Good afternoon, Your Honors. May it please the court, John Burick, and John Brickley with James McElroy and Diehl for the Appellee's Legacy Data Georgia and Shelly Peters, now Shelly Disser. We are back here now for a second time after this court previously issued its mandate in May of 2018, directing the district court to do two things. First, to impanel a jury to calculate the call price damages that were due and owing to the plaintiffs as a result of Kajolian's breach, a breach, Judge Harris, that you have acknowledged only occurred after the first trial was concluded. Secondly, to award attorneys' fees and to calculate those attorneys' fees to the prevailing party, the plaintiffs, which this court concluded in its first mandate that was applicable based on Section 11.6 of the Asset Purchase Agreement's trial. After this case was remanded, Judge Whitney did just both of those things. He impaneled a jury. The jury heard evidence over three days. The jury awarded damages to the plaintiffs in the amount of $1,591,094, which was bookended by the respective experts proposed by the plaintiffs and the defendant. The plaintiff's expert number was $1,000,676. The defendant's expert number was $1,039,000. So the jury's verdict was smack dab between those two bookended numbers. At the conclusion of the trial, all the parties submitted post-judgment motions. The plaintiffs requested fees again under Section 11.6 consistent with the mandate. The defendants initially asked for fees pursuant to the provisions of Chapter 75, pursuant to Chapter 1D, and pursuant to 621.5. And then in their reply for the first time, unconditionally and unprovisionally, requested fees under Section 11.6, the very provision that they say now is unenforceable. We believe that their arguments of error by the court for submitting evidentiary issues under Rule 402, 403, and 408 lack any merit, both procedurally and substantively. And we believe that the court did exactly what this court instructed it to do, this court did, that is, in awarding fees because the plaintiff already concluded to be the prevailing party under an applicable and reciprocal fee shifting agreement. I want to take those in order. I do want to address the third issue that Mr. Hiller did not address, which is their request for fees. Let me address first the issue under Rule 402, because primarily the arguments under Rule 402's relevance under Rule 403 is more prejudicial than probative, and under 408's exclusionary provisions for settlement discussions. Judge Harris, you were spot on. How could it not be relevant what these parties previously calculated when they are obligated to calculate the call price, and let me read you the language of the agreement because it's illustrative. The call price, the deferred purchase price, is to be made at one or two times, quote, all calculations and corresponding payment calculations, including upward and downward adjustments, shall be made in good faith by the buyer. The good faith obligation has nothing at all to do with liability. It has everything to do with the manner and method in which those damages are calculated. So, if Mr. Uhas is the only person, and he is the only person, that calculated this $225,000 downward adjustment to the EBITDA, resulting in, as your honors know, Judge Harris and Judge Motz from the first trial, every $1 of EBITDA reflected a $2.07 adjustment to the call price. Mr. Uhas is the only person that came up with this analysis of let's deviate from the agreement and let's find this suppression number of $225,000, yielding almost $487,000 of a deflated call price. And contrary to what the defendant, Kedrillion, tells you, everybody relied on those calculations. Everybody relied on that testimony. Mr. Kimball, their late expert who has identified what I mean by latest, he was the one that was in the last trial, they called him. They didn't call Phillips, who was the person that calculated all of the call price calculations. In the second trial, they only called him in the first trial. But Mr. Kimball admitted in his expert report, which you can find in the record beginning at Joint Appendix page 4786, he relied on the testimony of Mr. Uhas. And in Mr. Uhas' testimony in the first trial, he went through all of these calculations. He relied and, excuse me, he considered Mr. Phillips' testimony. And in Mr. Phillips' first trial, Mr. Phillips relied on every single one of his first relations. And Mr. Uhas is the person that has made these downward adjustment calculations both for the overhead and for Jackson Health. So how could his credibility and how could his assessment of how he comes up with those numbers that their expert relies upon not be relevant? It's clearly relevant. It's so relevant that they had reports about it, and they gave those reports to their expert when their expert was conducting an analysis. With regard to the more prejudicial and probative aspect of it, it's clearly relevant. The question now is, is it more prejudicial? And I would argue that it's not for a host of reasons. First, although based on Judge Whitney's initial ruling that I could get into all of the calculations that Mr. Uhas made in his deposition, and all of those calculations included the eight calculations that the defendants now complain of. So Mr. Uhas was called to his deposition both as a 30B6 witness and as an individual witness because he was initially named as a party in the first case. And during his deposition, as a topic of his 30B6 notice, I said, I'm going to ask you to calculate the call price. And he did. And in his deposition, he calculated the call price, I don't know how many times, but it was more than eight. And I put all eight of those numbers before the jury in the opening statement because Judge Whitney said that I could. He later, prejudicing who? The plaintiffs. Because the plaintiffs made a promise to this jury that they would provide a certain amount of numbers that they later could not produce because Judge Whitney reversed himself. We complied with that reversal, and we were not able to put any of the documents in, and we weren't able to talk about any of the $4,000. And I would submit to you that if we're asking for a 1,676,000 and they're asking for 1,039,000, my ability to get in a number of 574 prejudices only the plaintiffs and not the defendant because it gave them the ability of being able to argue that number. In fact, Mr. Shook, during the motions in limine prior to trial, alerted the court that I would be opening the door if I was able to put in all these numbers. And if you go back to the joint appendix, you'll see Judge Whitney's colloquy with me that says, you're right. You're opening up the door for those numbers. So the fact of the matter is there's no prejudice to the defendant for me putting in a number. But secondly, as Judge Harris hinted, it's clearly consideration for the jury about those numbers and why those numbers are all over the place. So it's not prejudicial to anyone but the plaintiff. It looks like, Judge Motz, you have a question? No, I was just going to ask you to go on to attorney's fees if you're ready to do that. You want me to address Rule 408 at all because I can do that quickly? But whatever. Okay. It's your time. Do whatever you want. Let me go to fees real quick and if I have time, I'll go back to Rule 408. Under the fee shifting provision, this court in its mandate instructed the trial court to calculate the amount of fees that are owed based on the outcome of the first trial and the breach of contract damages. The verdict for the plaintiff was $256,500. In the second trial, the jury awarded $1,591,094, which is 6.2 times more in the second trial than it was in the first trial. And as this court instructed Judge Whitney to do, he was to calculate the amount of damages due to the prevailing party that this court already concluded was a prevailing party under the fee shifting agreement, which this court concluded already applied to this case because it's clear in its language that it does, and award damages. I understand their argument now is that that fee provision doesn't apply. Well, that's convenient, isn't it? When they tried this case the first time, they argued that. At the conclusion of the first trial, the defendant's counsel argued that section 11.6 did not apply. They abandoned that argument when they came back to this court the first time. And here's what I mean by that. In the first post-judgment motion of briefings schedule, the defendant alleged that section 11.6 was inapplicable because it applies only to breaches of the non-competition and basically employment-related breaches. They abandoned that issue when they came to this court, arguing not that it didn't apply, but rather that the argued about the amounts of the fees and these kinds of things, and whether or not the fees were appropriate, whether or not the matters were intertwined, and those kinds of things. But they never argued that section 11.6 was not applicable. In addition, when the case went back on remand, conclusion in favor of the plaintiffs for $1,591,094, when we briefed the motion for they've waived the very argument that they're making today for the first time. They never argued that section 11.6 didn't apply. They assumed that it did. And all they argued was the amount of the fees, and then they asked for a reduction of fees based on their chapter 75, 6.1.5, and section 1D damages. So they've waived that if it even is able to not be waived based on the mandate rule. Judge Motz, you were right. It is what it is. You all made a ruling about that. That's what it is, unless you can find that it smells like a five-week-old dead fish that's been unrefrigerated. That's what this court has used it as analysis for, and I would submit to you that that's not the condition. However, once we got back to the second trial, and they actually never raised the issue of the applicability of 11.6 or the mandate waiver, in their reply, unconditionally, they in fact asked for their own fees under section 11.6. It isn't until Mr. Hiller gets involved that he suggests, oh, no, that shouldn't have happened. It should have been a conditional request. If you find that it's applicable, then we get our fees. But that's not what they said in their reply brief. For the first time, they asked for their own fees on a claim that all of the damages were interrelated to the claims of breach of contract, and that they're in fact the prevailing party because the tort claims have been excised by your honors in this first legacy one decision. So I don't think that based on the mandate rule that it's applicable. Substantively, I think the court got it right the first time. The document itself says in section 11.6, and I'll read it to you. It could not be more clear. In the event of any action, suit, or arbitration proceeding arising out of or relating to this agreement, there's an or. We'll get to that in a moment. But under the first provision, in the event of any action, suit, or arbitration proceeding arising out of or relating to this agreement, the prevailing party is entitled to attorney's fees. Well, there can be but no question that you initially found that we were the prevailing party. You ordered Judge Whitney to do exactly what he did. So there can't be any error there. The term agreement is a defined term, and it the argument somehow or another that there's a collision between this provision in 11.6 and perhaps the fee shifting provision in the employment agreement is nothing more than a red herring for a couple of reasons. First, they're not conflicting. They parallel. And by mathematics and physics, my professors in college told me parallel lines will never intersect, and they won't, and they don't, and they can't. So there's no intersection, and there's no dispute about those parallel tracks. Secondly, the application that this court, the analysis this court must engage in to determine whether or not attorney's fees are applicable, whether or not attorney fee provision is applicable and enforceable, requires that you go through a first step. And the first step under North Carolina General Statute 6-21.6 requires that you find the reciprocal fee shifting provision is found in a business contract. The asset purchase agreement is a business contract. We argue that below. You all affirm that below. It is a business contract. It's axiomatic that it is anyway. However, under our 6-21.6 statute in North Carolina, employment agreements, in fact, are not considered business contracts. So the fee provision in the employment agreement would not be applicable anyway. There's no statutory basis to support that. So there's not a conflict anyway, but if the court was to be concerned, is there a conflict with language that mirrors the very same requirement, that is to say that the prevailing party gets their fees, then you could jettison it under the analysis that there's no statutory provision for the fee shifting provision in 6-21.6 of the North Carolina statutes. So I think for all of those reasons, the fee shifting provision is there. To the extent you want to hear very briefly, I've got a short amount of time here about the alleged conflict between the fee shifting provision found in 11.6 of the agreement and the fee shifting provision found in the indemnification provisions of the asset purchase agreement. You all know that in general basic contract interpretation, you apply the specific over the general. The parties in the indemnification context, which is not a direct claim between the parties as you know, it's a claim made by a third party against one of the parties that may be liable because the other party failed to tell the truth on a condition or a warranty, and it permits those disputes to be submitted to arbitration. And in the arbitration proceeding, the parties agreed that the arbitrator could award fees, he or she could award fees in their discretion. It's not in conflict with the other one, it's just different. So I don't think that that negates the enforceability. But again, as Judge Motz aptly noted, I don't think you get there because of the mandate rule to begin with. I've got four minutes. I want to do just really quickly the 408 analysis because I think it's important. The McSherry case, Judge Motz, you concur to that opinion. Judge Diaz wrote that opinion. And in that opinion, the court struggled and made an analysis for a very early time. It wasn't exactly the first time, but it was one of the first two or three times that this court made an analysis to determine what is the claim. And as you'll recall, in the McSherry case, you had a broker, commissioner that was suggesting he was entitled to a fee from his employer for selling a piece of property. The agreement was passively structured in the form of an email and some red lines to that email. The employer wrote a letter pre-sale of the property that was auctioned by the broker and indicated that once the property sold, the broker would be terminated from his services. The property sold. When the property sold, the commissioner, the broker said, I'm entitled to 75 basis points commission based on our agreement. And there were compromise statements, which is what this court couched them as, compromise statements. That occurred after the property sold, which if there's a contract, there would be a claim to money. There'd be a right to money. It would just be an argument of the amount of money, assuming the parties agreed that there was money. That's not the case we have here. In McSherry, the court concluded that because you could actually identify an obligation to make a payment and you could identify an amount based on a sale, there's actually a dispute and you have a claim. In this instance, under Rule 408, before you can get to the exclusions under 408B, you've got to analyze whether or not you have settlement discussions of Compromise 1 and whether they're over a claim 2. There's no claim but for and until Kedroian exercises the call. Kedroian can do all the calculations it wants to do before, but it has no obligations to make any payments until it exercises the call. Imagine for a moment they're exchanging numbers prior to the call being calculated and Ms. Disser says, hey, you calculated the call price of $3 million. And they say, we're not going to exercise the call. Would you all let come into court and say, we have a claim here? You're allowed to make your claim? There is no claim until the call is exercised. So just like the court did in Coleman versus Mississippi, which analyzed a Fifth Circuit decision, there was a pre-condemnation set of discussions, and the court concluded that until the condemnation occurred, there was no right or entitlement to any claims. So just like there, there's no right, there's no entitlement, there can't be a claim. Moreover, it is clear on the face of the documents that are before the court that all of Scharf-Perez's calculations were being done for the sole purpose of calculating the call price. There was never an offer of compromise for anything. Quickly, I've got two minutes. I want to address their fee request. First, I want to remind the court, in the prior proceeding, they made no request for fees at all. They did that despite the fact that the Chapter 75 claim had already been resolved in favor of the plaintiff with regard to there actually being unfair trade practices, but the jury concluded they were not inter-affecting commerce. So that claim is gone. The court had already jettisoned at the close of all the evidence that are under a directed verdict request that the abuse of process claim be gone. There was no request for fees under Chapter 75 or under Chapter 6-21.5 on the basis of either a frivolous or malicious claim or under the basis of a non-decisional issue of fact or law for the jury. They never made those requests. The first time they had made a request for fees, it wasn't when the mandate came back. That would have been a novel time to have done it. Rather, they waited until after the second trial was concluded, and UHAS and LDA North Carolina are no longer actual parties to the dispute because the only claim was a breach of contract on the APA, the parties of whom are so those parties only made a claim late. They didn't make a request for anything under Chapter 11.6 of the Asset Purchase Agreement, but they did so provisionally in the event that this court did that. So I think they received the rights to make any of those claims because they didn't make them initially when they had an opportunity to make them. On the merits of the case, we were the prevailing party in the breach of contract claim. Having not requested fees when they could have, either at the conclusion of the first trial or even if they were late and they wanted to pigeonhole it into this case, they could have done it at Legacy 1 and they didn't do that. So we believe that Judge Whitney was proper in allowing all of the evidence. I see I've got no time if I could just complete this one sentence or answer any questions you have. Yes. Thank you. We believe that Judge Whitney was proper in allowing all of the evidence under Rules 402, 403 and 408. They were clearly relevant. There's no prejudice for a witness's calculation of its own call price in a deposition pursuant to a topic which says calculate the call price for us to recite the call price, which we weren't able to do in evidence, but we were able to do an opening. Remember, the court excluded that at the actual trial. None of those numbers got before the jury by way of evidence. And we believe that 408 is not applicable. We believe that the mandate rule precludes the defendants from arguing anything in contravention of this court's initial mandate, allowing us to have fees and appropriate fee shifting provision of 11%. And we think that on the merits of that case, we're correct because the asset purchase agreement clearly defines agreement. And this was a breach of the agreement. And lastly, we believe that the defendants have waived the right to seek any fees and both procedurally and on the merits of their request are not permitted to fees. And I'm happy to answer any questions the court might have. Thank you, Your Honor. Thank you, Mr. Buerk. All right, Mr. Hiller, you have some time reserved. Thank you, Your Honor. I'm going to jump right in on the Rule 408 question. I heard my friends say that the draft call price calculations that Kadrillion sent early on in the life of the plaintiff were somehow not settlement communications. Let me read briefly plaintiff's own words throughout this case. This first is page 40 of the red brief. I think it's still the red brief, plaintiff's telebrief. Quote, call price calculations were also referenced in proposed settlement agreements. End quote. That's their brief in this court. Before that, at trial, they said, quote, everything we got sent was while the settlement was going. End quote. That's joint appendix page 5135. That's plaintiff's counsel during a sidebar. Again, everything we got sent was while the settlement was going. Five pages later, at joint appendix page 5040, plaintiff's counsel admits that, quote, they happen to also be in the form of a settlement agreement. End quote. So the notion that the draft call price calculations, which the record shows make up most of the prior calculations that plaintiffs introduced, as well as the ones that plaintiffs chose to emphasize with their first witness, Disser, and their second witness, Peters, there is simply no dispute that it's mostly contained in settlement material that falls right in the heartland of Rule 408. And it also knocks out the idea that they could use this for impeachment. And Rule 408A is explicit that you cannot use Rule 408A material to impeach by a prior inconsistent statement, which is really the only argument I heard my friend make as to what a few other issues to touch on on the question of why a retrial is warranted. He brought up the fact that the verdict here fell between the numbers that our side's expert proposed and that their expert proposed. Again, that's a fallacy, Your Honors, as we show in the brief. That may be relevant to a sufficiency of the evidence challenge. It is not relevant to a prejudicial error challenge. That's what this court said in the McSherry case that we cite, as well as the both of those cases, the court said there's no dispute or we will assume way that the evidence would have permitted a jury to reach the conclusion it did. Instead, our question is, did the improper evidence substantially sway the jury to pick one number or the other? And here we think it is crystal clear from the record, if Your Honors look at the opening statement, if you look at what the evidence they chose to emphasize, you know, from our perspective, the bottom line is that when this court remanded, the plaintiffs had a choice. You know, option one was to stick to the fairly dry evidence relevant to the two issues on which or the four at most issues on which the experts disagreed. Option two was to turn it into a tort case all over. They very clearly chose option two, and to their credit, they did it very effectively with great prejudice. They argue that the evidence about prior calculations was relevant because Section 3.3 of the Purchase Agreement says the quadrillion shall calculate the call price in good faith. That is purely a liability issue. In the retrial, quadrillion is not calculating the call price. Plaintiffs are not calculating the call price. Only the jury is calculating the call price. Concepts of good faith simply have nothing to do with it. Instead, both sides present their evidence affirmatively of what they think the call price is and the jury picks. And my friend simply has no explanation for why, in their case in chief, over and over again, they would need to get into evidence of what the call price isn't, these prior calculations, other than to prejudice the jury. And finally, on the 11.6 issue, we would just rest on the arguments we make in the brief. The word agreement is used throughout 11.6, and in every one of the no basis to construe to have a completely different meaning in the middle of the paragraph compared to the rest of the paragraph. I've seen them over time, and with that, unless the court has any questions, rest and appreciate the chance to speak. All right. Thank you, counsel. Thank you both for your arguments. We really appreciate it. And we cannot come down and greet you as we do in our wonderful tradition of the Fourth Circuit, but know that we appreciate very much your arguments and you helpfully help us resolve these issues. Thank you so much. And we should both be safe and stay well. And we'll ask the clerk to adjourn the court for the day. Thank you, Your Honor. Thank you. This honorable court stands adjourned. God save the United States and this honorable court.
judges: Roger L. Gregory, Diana Gribbon Motz, Pamela A. Harris